**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                    :
UNICASA MARKETING GROUP, LLC,       :
                                    :
        Plaintiff,                  :
                                    :        Civil Action No. 04-cv-4173 (PGS)
        v.                          :
                                    :
MARTHA SPINELLI, AMERICAN           :
DREAM HOME REALTY CORP., d/b/a      :
UNICASA AMERICAN DREAM HOME         :           **OPINION**
REALTY, UNICASA AMERICAN            :
DREAM HOME REALTY, AURELIO          :
ARIAS and JOHN and/or JANE DOE,     :
                                    :
        Defendants,                 :
                                    :
        - and -                     :
                                    :
AMERICAN DREAM HOME REALTY          :
CORP. and MARTHA SPINELLI,          :
                                    :
        Defendants/Third-Party      :
        Plaintiffs,                 :
                                    :
        v.                          :
                                    :
CARLOS CHAUX, MARLIO CHAUX          :
and UNICASA UNIVERSAL, INC. a/k/a   :
UNICASA UNIVERSAL REALTY            :
CORP.,                              :
                                    :
        Third-Party Defendants      :
_____ :

**SHERIDAN, U.S.D.J.**

Plaintiff, Unicasa Marketing Group, LLC ("Unicasa"), the owner of the Unicasa name and

mark, brings this action for trademark infringement, unfair competition, and trademark dilution

against Defendants American Dream Home Realty Corp. d/b/a Unicasa American Dream Home Realty ("ADHR"), Martha Spinelli, and Aurelio Arias, following ADHR's continued use of the Unicasa name and mark after Unicasa terminated the parties' oral agreement for use of the mark on May 21, 2004.   Defendants assert Affirmative Defenses, Counterclaims, and a Third Party Complaint, alleging, among other things, an assignment of rights, naked licensing, breach of contract, and unjust enrichment.  Despite numerous factual disputes, both parties herein move for summary judgment.

I.

In or around December 1994, third party defendant Marlio Chaux and Joseph Torres founded Plaintiff Unicasa Marketing Group, LLC, with the intention that it would engage in real estate marketing.  The Unicasa mark and business model was created and used by plaintiff since that time. The Unicasa mark was registered with the United States Patent and Trademark Office on July 8, 1997.

In or around October 1997, plaintiff granted to ADHR, founded by Martha Spinelli (now known as Martha Calcines), the right to use the Unicasa name for its realty business in Dover, New Jersey.  According to defendants, when it opened its first store, plaintiff did not impose any restriction on defendants' use of the Unicasa name other than that it operate in the real estate business.  Defendants were subsequently granted permission to use the Unicasa name and mark in the operation of ADHR in Fort Lee, New Jersey and Paterson, New Jersey.  None of the agreements to use the Unicasa name and mark were placed in writing.  Furthermore, the oral agreements did not speak to the duration of the right to use the name and mark.

On July 1, 2002, plaintiff sent to defendants a licensing agreement for defendants to sign or

lose its right to use the Unicasa name.  Defendants refused to signed the agreement, which placed additional restrictions on the use of the Unicasa name.  Defendants continued to use the Unicasa name and mark with no formal objection from plaintiff.

On April 30, 2004, plaintiff, again, sent to defendants a licensing agreement which defendants refused to execute.  On May 21, 2004, plaintiff terminated defendants' right to use the Unicasa name and mark.  Defendants, however, continued to use the Unicasa name and mark after May 21, 2004.

On August 27, 2004, plaintiff instituted the instant action against defendants, claiming trademark infringement, unfair competition, and trademark dilution.  In response, defendants maintained that plaintiff initially encouraged defendants to use the Unicasa name without payment or material restriction.  Thereafter, in or about 1998, the parties entered into an agreement for the use of the mark in exchange for "membership dues" with plaintiff providing to defendants marketing services for their business.  Defendants argue that plaintiff breached its agreement by demanding that defendants sign a licencing agreement which significantly limited defendants' right to use the Unicasa name.

II.

*Defendants' Motion for Summary Judgment*

Defendants make several arguments in support of its motion for summary judgment.  It is argued that plaintiff assigned its rights to the Unicasa name to defendants, abandoned its mark, excessively delayed in commencing this action, and/or acquiesced in defendants' unauthorized use of the mark.  All of these theories are disputed, and necessarily require findings of fact to determine their viability.

3

A. <u>Assignment of Rights</u>

As a very basic general principle, the owner of a trademark may license the trademark to other parties.  "[A] license to use a mark does not pass title to the trademark because it is a transfer of limited rights, less than the whole interest which might have been transferred." *Acme Valve & Fittings Co. v. Wayne*, 386 F.Supp. 1162, 1165 (S.D.Tex.1974).  An agreement conferring a license to use a trademark for an indefinite time may be oral and is terminable-at-will by the licensor. *Dial-A-Mattress Operating Corp. v. Mattress Madness*, 847 F.Supp. 18, 20 n. 1 (E.D.N.Y.1994); see also *Letica Corp. v. Sweetheart Cup Co.*, 805 F.Supp. 482, 487 (E.D.Mich.1992) (citing *Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc.*, 200 U.S.P.Q. (BNA) 282, 289, 1978 WL 21729 (S.D.Fla.1978)) ("A license agreement may be oral.").  Continued use of a trademark by a licensee after the termination of the licensing agreement constitutes trademark infringement. See *Church of Scientology Int'l v. Elmira Mission of Church of Scientology*, 794 F.2d 38, 45 (2d Cir.1986); *ITT Industries, Inc. v. Wastecorp. Inc.*, 87 Fed.Appx. 287, 293 (3d Cir. 2004).

Defendants argue that the oral agreement, in or around 1997, was not an agreement to license the Unicasa mark to defendants, but rather an assignment of rights to the mark.  To support this contention, defendants point to the lack of any specific duration on the usage of the Unicasa name and the lack of a licensing agreement.  However, defendants fail to recognize that "a license can be oral" and "the Lanham Act requires that assignments of federally registered marks...be in writing." *3 McCarthy on Trademarks and Unfair Competition §18:43* (4th ed. 2007).  Even if the Court were to accept a contrary reading of the Lanham Act, such as that suggested by the Third Circuit in *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 822 (3d Cir. 2006)("Even if a writing is lacking, an assignment may be proven in other ways."), where an "assignment of

4

trademark rights does not have to be in writing, an implied agreement to transfer requires conduct manifesting agreement." *Seeburg Corp. v. AMR Pub.*, 80 F.Supp.2d 723, 728 (W.D.Mich. 1999)(citing *TMT North America Inc. v. Magic Touch GmbH*, 124 F.3d 876, 883 (7th Cir. 1997)). Defendants have pointed to no such conduct on the part of the plaintiff that would suggest the intent of an assignment.  In fact, the conduct of plaintiff demonstrates just the opposite.  Subsequent to the initial agreement to use the mark, defendants sought and received permission from plaintiff to open offices in Fort Lee and Paterson, New Jersey using the Unicasa name.   Furthermore, plaintiff licensed the use of the mark to 18 other persons or entities following defendants' agreement with plaintiff to use the mark.

      B. <u>Naked Licensing</u>

      Alternatively, defendants argue that plaintiff abandoned its mark.  If the owner of a trademark chooses to license the use of his trademark to others, the owner then had a "duty to exercise control and supervision over the licensee's use of the mark." *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir.1959); see also *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 277 F.3d 253, 259 (2d Cir.2002); *General Motors Corp. v. Gibson Chemical & Oil Corp.*, 786 F.2d 105, 110 (2d Cir.1986); *Sheila's Shine Products, Inc. v. Sheila Shine, Inc.*, 486 F.2d 114, 124 (5th Cir.1973).  A trademark license is typically written and contains express terms giving the licensor power to engage in quality control to ensure that the licensee does not engage in mere "naked" use of the mark.   Failure to provide quality control may constitute naked licensing, leading to abandonment of the mark. *Ditri v. Coldwell Banker Residential Affiliates, Inc.*, 954 F.2d 869, 873 (3d Cir.1992).

      Naked licensing is an "[u]ncontrolled licensing of a mark whereby the licensee can place the

5

mark on any quality or type of goods or services," raising "a grave danger that the public will be deceived by such a usage." *2 McCarthy on Trademarks § 18:48*. "[T]he only effective way to protect the public where a trademark is used by licensees is to place on the licensor the affirmative duty of policing in a reasonable manner the activities of his licensees." *Dawn Donut Co.*, 267 F.2d at 367; see also *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir.1977) ("Courts have long imposed upon trademark licensors a duty to oversee the quality of licensees' products.").

"When the trademark owner fails to exercise reasonable control over the use of the mark by a licensee, the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods and services that are under the control of the owner of the mark." *2 McCarthy on Trademarks §18:48* (quoting *Restatement (Third) of Unfair Competition § 33, cmt. b* (1995)). This may result in the trademark ceasing to function as a symbol of quality and controlled source, leading to an involuntary loss of trademark rights. *Id.*

To the extent that plaintiff may rely on a naked licensing theory, its burden is high, and its application is fact sensitive. "Because naked licensing if established is treated as an abandonment of the trademark, which triggers the loss of trademark rights against the world, anyone attempting to show such abandonment via naked licensing faces a stringent burden of proof." *Doeblers' Pennsylvania Hybrids*, 442 F.3d 812, 824 (3d Cir. 2006); *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000); see also *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 139 (3d Cir. 1981)("abandonment, being in the nature of a forfeiture, must be strictly proved"); *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir. 1976)("Because

a finding of insufficient control essentially works a forfeiture, a person who asserts insufficient control must meet a high burden of proof.").[1]

Here, defendants argue that plaintiff imposed only superficial limitations on the use of the mark and did nothing to control the quality of services provided by defendants or other Unicasa offices.  It is alleged that when plaintiff began granting permission to its affiliated offices to use the Unicasa name in the late 1990s, the only limitations or restrictions were that (1) the name be used in the real estate business; (2) the aesthetic appearance of the name and logo conform with plaintiff's sample specimen; and (3) the offices obey existing laws and regulations applicable to real estate offices.  Defendants maintain that plaintiff did not otherwise limit or control the manner in which the Unicasa offices delivered real estate services to the public.

Over time, according to defendants, plaintiff continued to overlook the quality of services provided by Unicasa offices and by 2004 had only placed the following limitations on the use of the Unicasa name: (1) to use the Unicasa name in the real estate business; (2) to use the name and mark in accordance with specifications for the use of the name and mark as determined by plaintiff; (3) to pay fees for the use of the name and mark; (4) to use approved letterhead and business cards; (5)

---

[1]  The Court acknowledges defendants' argument of an alternative version to the naked license defense pursuant to *Miller v. Glenn Miller Productions*, 318 F.Supp.2d 923, n.12 (C.D. Cal. 2004).  There, the California District Court explained that under this:

> second version of the defense, a licensor's failure to supervise and control a particular license may estop him from challenging a particular licensee's use of the mark.  Because the consequence of such a failure is the licensor's loss of rights against only one licensee, presumably the burden of proof on the defendant is lesser.

(internal citations omitted).  Considering the Third Circuit's recent opinion in *Doeblers' Pennsylvania Hybrids*, 442 F3d 812, the factual scenario presented to the Court an opportunity to adopt such a less stringent standard.  The Third Circuit's failure to mention this "second version" leads this Court to believe that the Third Circuit does not recognize an alternative naked licensing defense imposing a lesser burden.

to attend marketing and training sessions; (6) to execute a license agreement; and (7) to otherwise comply with all directives from plaintiff concerning the use of the name and mark.

Moreover, from the time defendants were granted permission to use the Unicasa name and mark to the time when plaintiff first insisted that defendant execute a licensing agreement, defendants argue that plaintiff never instructed defendants on how to handle client intake, how to advise clients on how to shop for real estate, how to advise clients on how to prepare a property sale, or how to prepare a contract for the purchase or sale of real estate. Further, defendants contend that plaintiff failed to supervise or oversee the operation of the various Unicasa offices, other than by observing how they presented the Unicasa logo on signs, advertising, stationary, and business cards.

Title 15 U.S.C. § 1127 provides that:

> [a] mark shall be deemed "abandoned" . . . [w]hen any course of conduct of the owner, including acts of omission as well as commission, causes the mark to become the generic name for the goods or services on or in connection with which it is used or otherwise to lose its significance as a mark.

"Naked licensing," occurs "[w]hen a trademark owner fails to exercise reasonable control over the use of a mark by a licensee," such that "the presence of the mark on the licensee's goods or services misrepresents their connection with the trademark owner since the mark no longer identifies goods or services that are under the control of the owner of the mark" and the mark can no longer provide "a meaningful assurance of quality." *Restatement (Third) of Unfair Competition § 33, cmt. b* (1995).

As alluded to above, the oral agreement between the parties created a licensor-licensee relationship. However, as a licensee, defendants may be estopped from making the naked licensing argument. *Creative Gifts, Inc. v. UFO*, 235 F.3d 540, 548 (10th Cir. 2000), summarizes in relevant

8

part the established law of licensee estoppel in trademark cases:

> The licensee is estopped from claiming any rights against the licensor which are inconsistent with the terms of the license. This is true even after the license expires. He is estopped from contesting the validity of the mark,...or challenging the license agreement as void or against public policy, e.g., because it granted a naked license. But he may challenge the licensor's title to the mark based on events which occurred after the license expired.

*Id.* (citing *3 Rudolf Callmann, Unfair Competition, Trademark & Monopolies § 19.48*, at 434 (Louis Altman 4th ed. 1998 and 2000 cum. supp.)); accord, *McCarthy, Trademarks & Unfair Competition § 18:63* (4th ed. 2000).  Thus, it would seem, according to *Creative Gifts*, that because defendants' claim is based on plaintiff's failure to police or control the mark during the life of the license, defendants may be estopped from arguing naked licensing.  It is noted, however, that there is a split in the authority as to whether the licensee estoppel rule applies to a licensee's challenge to a licensor's title on the ground that the licensor failed to adequately protect the validity of the mark through sufficient quality control over licensees.  No case out of this Circuit makes clear the Third Circuit's position on the issue. See *Doeblers' Pennsylvania Hybrids*, 442 F.3d at 825, n. 12 (choosing not to address the propriety or applicability of "licensee estoppel").  Regardless of whether defendants are estopped or not, it cannot be said, as a matter of law, that defendants were granted a naked license.  There are sufficient factual issues that remain.  It is for the trier of fact to determine whether the controls put in place were sufficient to provide a meaningful assurance of quality.

C. <u>Trademark Dilution</u>

Defendants next seek summary judgment on plaintiff's trademark dilution claims.  The Federal Trademark Dilution Act of 1995 provides:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection.

15 U.S.C. § 1125(c)(1).  Thus, to prove a violation, a plaintiff must establish: (1) the plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in § 1125(c)(1); (2) the defendants are making commercial use in interstate commerce of a mark or trade name; (3) defendants' use began after the plaintiff's mark became famous; and (4) defendants' use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish the goods or services.  *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000) (citing *4 McCarthy, supra, § 24:89*; *Hershey Foods Corp. v. Mars, Inc.*, 998 F.Supp. 500, 504 (M.D.Pa. 1998)).   The eight non-exclusive factors in determining the famousness of a mark include: (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods and services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. See 15 U.S.C. § 1125(c)(1)(A)-(H).

10

Defendants contends that "[b]y February 2001, the public was still not familiar with the 'Unicasa' name" and "[p]laintiff has not provided concrete evidence of the extent of its investment or effort in developing its reputation and fame, or any degree of fame in the general marketplace." However, these brief arguments, without more, do not sustain defendants' burden on a motion for summary judgment. The Court cannot find, as a matter of law, that plaintiff's mark is not famous. This is clearly a factual dispute, properly within the domain of the trier of fact.

D.   Estoppel, Laches, & Acquiescence

Defendants next argue estoppel, laches, and/or acquiescence. Each of these arguments are factual in nature. It is maintained that plaintiff's failure to exercise meaningful control or supervision over defendants for at least five years should effectively estop plaintiff from alleging infringement of the mark. Defendants further claim that the delay between defendants' first refusal to execute a written licensing agreement in 2002 and the termination of the right to use the Unicasa mark in 2004 should bar plaintiff's claims. Lastly, it is asserted that the granting of the right to use the Unicasa name without a time limitation "suggests that Plaintiff gave assurance to [defendants] that it would never assert its trademark rights against them, thereby acquiescing in their use of the name." It is difficult for the Court, as a matter of law, to find for defendants on summary judgment and preclude plaintiff's claims. Such findings are fact oriented.

E.   Individual Liability

Lastly, defendants seek to dismiss all counts of the Complaint as asserted against the individual defendants, Spinelli and Arias. Defendants argue that, generally, corporate officers are not liable for the debts of a corporation absent tortious or other unlawful acts. "The plain language of the sections of the Lanham Act addressing trademark infringement and unfair competition create

11

individual liability for damages under the Act because both sections begin with the language 'Any person who....'" *Heartland Payment Systems, Inc. v. Merchant Services of America, Corp.*, 2006 WL 3779764, *5 (D.N.J. 2006)(citing 15 U.S.C. § 1114(1), 15 U.S.C. § 1125(a)(1)).  Under the Lanham Act an employee is not shielded from individual liability solely because the infringing actions were within the scope of their employment. *Metromedia Steakhouses Co., L.P. v. Resco Mgmt., Inc.*, 168 B.R. 483, 486 (D.N.H.1994).  "The fact that the persons ... are acting for a corporation ... may make the corporation liable under the doctrine of respondeat superior. It does not relieve the individuals of their responsibility." *Mead Johnson & Co. v. Baby's Formula Serv., Inc.*, 402 F.2d 19 (5th Cir. 1968)(holding corporate officer individually liable for trademark infringement).

A trademark is infringed by an individual who "performs the act or does the things that the patent or trademark law protects against....[I]f there was an infringement by the corporation, this infringement was caused by some one or more persons either officers or employees of the corporation who caused the acts to be done." *Id.*; see *Brandywine Mushroom Co. v. Hockessin Mushroom Prods., Inc.*, 682 F.Supp. 1307, 1312 (D.Del.1988) (denying motion for summary judgment as to individual defendant because there was sufficient evidence that she was an "active participant" in the trademark infringing sales).

Here, plaintiff alleges that Spinelli was ADHR's controlling figure and was instrumental in its infringing use of the Unicasa mark.  Spinelli was the person with whom plaintiff communicated and who held herself out as the person who controlled ADHR's decisions concerning the use of the mark.  Arias is and was the licensed broker of record for ADHR.  It is argued that if not for Arias, ADHR could not operate as a real estate brokerage and would have been forced to discontinue operation.  While the Court has little difficulty, given the case law, denying the motion for summary

judgment as to Spinelli, same cannot be said for Arias.  Arias made no decisions to continue to use the Unicasa mark after plaintiff allegedly terminated ADHR's right to use the mark.  Holding Arias liable on some nebulous claim that he was the sole means by which the company could operate extends the reach of the statute beyond that which Congress intended.

III.

*Plaintiff's Motion for Partial Summary Judgment*

Plaintiff has also moved for summary judgment on its claims for trademark infringement, unfair competition, and trademark dilution and to dismiss defendants' Affirmative Defenses, Counterclaims, and Third Party Complaint.

A. <u>Trademark Infringement</u>

Plaintiff first moves for summary judgment on its infringement claim, seeking damages and a permanent injunction on defendants' use of the Unicasa mark.  Citing to *Birthright v. Birthright Inc.*, 827 F.Supp. 1114, 1134 (D.N.J. 1993), plaintiff notes that to succeed on a trademark infringement claim under Section 32, a plaintiff must establish three elements: (1) that the mark is valid and legally protectable; (2) that the mark is owned by the plaintiff; and (3) that the defendants' use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.  Additionally, where defendants' previous use of the mark occurred with plaintiff's permission, plaintiff must also establish that defendants' use of the mark is unauthorized. *Id.  Birthright* explains that "[t]he first and second elements of plaintiff's Section 32 infringement claim - the validity, ownership, and protectability of the mark - may be proven by a showing that the mark at issue was federally registered and had become 'incontestable' under the Lanham Act," *Id.*, which the Unicasa mark became, according to plaintiff, on November 14, 2002.  The third element,

13

is also satisfied, according to plaintiff, as "there is a great likelihood of confusion when an infringer uses the exact trademark." *Birthright*, 827 F.Supp. at 1136.  With regard to the final additional element noted in *Birthright*, plaintiff maintains that defendants' use of the mark was unauthorized following the letter from plaintiff's attorney dated May 21, 2004, terminating defendants' right to use the mark.

In opposition, defendants reiterate their arguments previously asserted in support of its motion for summary judgment: assignment of rights and naked licensing.  Additionally, defendants argue that the registration of the Unicasa mark does not render the mark immune from attack and that the Unicasa name has not resulted in confusion.

Defendants' argument of an assignment, as explained above, was summarily rejected as without merit.  As for the claim of a naked license, it would seem that factual issues remain.  However, it is unclear whether this defense can even be raised.  If not, defendants are left with its last two arguments.   In support of its argument against plaintiff's claim of incontestability, defendants cite to 15 U.S.C. §1065, and stress the opening passage:

> Except on a ground for which application to cancel may be filed at any time under paragraphs (3) and (5) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark, the right of the registrant to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable . . .

Defendants then cite to portions of 15 U.S.C. §1064(3):

14

A petition to cancel a registration of a mark . . . may . . . be filed . . ..by any person who believes that he is or will be damaged . . . by the registration of a mark on the principal register established by this chapter . . .

\*\*\*

(3) At any time if the registered mark . . . has been abandoned . . .

On December 2, 2005, ADHR filed a Petition for Cancellation, requesting cancellation of the registration of the Unicasa mark.  Thus, defendants argue that the mark is contestable and cannot serve as a basis for entry of summary judgment on plaintiff's claim of trademark infringement.

Incontestable status is "conclusive evidence of the validity of the registered mark." 15 U.S.C. § 1115(b) (1994).  Once a mark gains incontestable status, its registration can only be challenged on the grounds stated in § 14 of the Lanham Act, 15 U.S.C. § 1064, such as, "if the registered mark becomes the generic name for the goods or services, . . .  has been abandoned, . . . or its registration was obtained fraudulently." 15 U.S.C. § 1064(3).  Otherwise, an incontestable mark cannot be challenged, for example, for mere descriptiveness, or on the basis that the mark lacks secondary meaning. See *Park 'N Fly, Inc. v. Dollar Park & Fly*, 469 U.S. 189, 196, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).  Incontestable status is attained by filing a § 15 affidavit with the Commissioner within one year after a five-year period in which the federally registered mark has been in continuous use and is still in use in commerce. See 15 U.S.C. § 1065(3); 37 C.F.R. § 2.167.  An applicant must declare that: (1) there has been "no final decision adverse to . . . registrant's right to register the [mark] or to keep the same on the register," and (2) there is "no proceeding involving said rights pending in the Patent and Trademark Office or in a court and not finally disposed of." See 37 C.F.R. § 2.167(d), (e).

15

Plaintiff notes that defendants fail to point to a single case that would suggest that the filing

of a Petition for Cancellation renders a previously "incontestable" mark, "contestable." The Court's

research has found no such case either. Until such time as defendants' Petition for Cancellation is

ruled on by the U.S. Patent and Trademark Office, the mark is deemed incontestable for purposes

of this Court.

Defendants also argue that the Unicasa name has not resulted in confusion. While defendants

contend that plaintiff has failed to meet its burden of proof on this element, the *Birthright* Court

engages in a discussion which addresses the instant situation. That Court stated:

> Under controlling law, the determination that defendants' service
> marks are virtually identical to plaintiff's suffices to support a
> conclusion of a likelihood of confusion. As the Third Circuit has
> noted, "there is a great likelihood of confusion when an infringer uses
> the exact trademark." Accordingly, the court holds that there is a
> likelihood of confusion.

*Birthright*, 827 F.Supp. at 1136 (internal citations omitted). There is no issue of fact concerning the

use of the mark. Defendants were admittedly using the Unicasa mark. This fact appears to satisfy

the Third Circuit's test to find the existence of a likelihood of confusion.

Therefore, defendants are left with their final defense of a naked license. While neither party

has addressed the validity of such a defense in this Circuit, the Court is reluctant to bar a defense

without briefing and a factual hearing. Hence, summary judgment is denied.

B. Unfair Competition

The elements for an unfair competition claim under Section 43(a)(1)(A) of the Lanham Act

are "(1) that the trademark or trade name is distinctive and therefore, protectable; and (2) that the

second comer's actions cause a likelihood of confusion among the relevant consumers." *Birthright*,

16

827 F.Supp. at 1136 (quoting *Dominion Bankshares Corp. v. Devon Holding Co., Inc.*, 690 F.Supp. 338, 344 (E.D.Pa.1988)).[2]   As previously discussed, whether the mark is protectable is an issue to be resolved by a determination of the naked license defense.  Thus, plaintiff's motion for summary judgment on this count is denied.

    C.  <u>Trademark Dilution</u>

      As stated above, to prove a violation of the Federal Trademark Dilution Act, a plaintiff must establish: (1) the plaintiff is the owner of a mark that qualifies as a "famous" mark in light of the totality of the eight factors listed in § 1125(c)(1); (2) the defendants are making commercial use in interstate commerce of a mark or trade name; (3) defendants' use began after the plaintiff's mark became famous; and (4) defendants' use causes dilution by lessening the capacity of the plaintiff's mark to identify and distinguish goods or services.  *Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 163 (3d Cir. 2000) (citing *4 McCarthy, supra, § 24:89*; *Hershey Foods Corp. v. Mars, Inc.*, 998 F.Supp. 500, 504 (M.D.Pa. 1998)).   The eight non-exclusive factors in determining the famousness of a mark include: (A) the degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods and services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar

---

    [2]  The test for [New Jersey common law unfair competition and infringement] is identical to the test for federal unfair competition and infringement.  *Apollo Distributing Co. v. Jerry Kurtz Carpet Co.*, 696 F.Supp. 140, 143 (D.N.J. 1988).

marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. See 15 U.S.C. § 1125(c)(1)(A)-(H).

In arguing the fame of the mark, plaintiff offers the incontestability of its mark to establish its distinctiveness. Beyond this, however, plaintiff merely offers that Unicasa "has been using the mark since 1994 over a wide geographical area encompassing New Jersey, New York, and Florida...[and] has spent a considerable sum on advertising the Unicasa brand in those areas." Apart from being woefully deficient to meet its burden on a motion for summary judgment, defendants identify several inaccuracies in this statement. While plaintiff may have been using the Unicasa name since 1994, there was no presence in Florida until at least 1999. There is further no evidence as to when defendants began its operations in New York, which presence apparently no longer exists. Additionally, defendants point out that the Application for Trademark Registration filed by plaintiff indicates that plaintiff did not begin to use the Unicasa name until 1995. Moreover, plaintiff fails to provide the Court with any figures representing the "considerable sum" spent on advertising. Suffice it to say, there is a question of fact with regard to the "fame" test, not only with the factors addressed, but also the majority of the factors which were unaddressed by plaintiff.

D. Affirmative Defenses[3]

Defendants' Second Affirmative Defense states that "[p]laintiff is not entitled to recover any profits or damages because defendants had no actual notice of the registration." 15 U.S.C. §1111 provides that:

---

[3] Defendants fail to oppose the dismissal of the First, Fourth, Seventh, Eighth, Ninth, and Fourteenth Affirmative Defenses. Those defenses are dismissed. For reasons previously discussed, the motion as to the Fifth (abandoned mark), Tenth (laches, waiver, estoppel, and acquiescence), and Thirteenth ("naked license") Affirmative Defenses are denied.

> a registrant of a mark registered in the Patent and Trademark Office,
> may give notice that his mark is registered by displaying with the
> mark the words "Registered in U.S. Patent and Trademark Office" or
> "Reg. U.S. Pat. & Tm. Off." or the letter R enclosed within a circle,
> thus ®; and in any suit for infringement under this chapter by such a
> registrant failing to give such notice of registration, no profits and no
> damages shall be recovered under the provisions of this chapter
> unless the defendant had actual notice of the registration.

To prove actual notice, plaintiff offers that Unicasa regularly used the ® symbol with its mark and, further, points to the termination letter sent to Spinelli on May 21, 2004 which indicated to defendants that Unicasa was the owner of the registered Unicasa mark.  In opposition, defendants request that this affirmative defense not be dismissed for the limited purpose of limiting plaintiff to profits or damages arising after May 21, 2004.

The Third Affirmative Defense provides that "[p]laintiff is not entitled to recover any profits or damages because the alleged acts were not committed with knowledge that such imitation, if any, is intended to be used to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. 1114(1) provides:

> (1)      Any person who shall, without the consent of the registrant--
>
> (a)      use in commerce any reproduction, counterfeit, copy, or
> colorable imitation of a registered mark in connection with the sale,
> offering for sale, distribution, or advertising of any goods or services
> on or in connection with which such use is likely to cause confusion,
> or to cause mistake, or to deceive; or
>
> (b)      reproduce, counterfeit, copy, or colorably imitate a registered
> mark and apply such reproduction, counterfeit, copy, or colorable
> imitation to labels, signs, prints, packages, wrappers, receptacles or
> advertisements intended to be used in commerce upon or in
> connection with the sale, offering for sale, distribution, or advertising
> of goods or services on or in connection with which such use is likely
> to cause confusion, or to cause mistake, or to deceive, shall be liable
> in a civil action by the registrant for the remedies hereinafter

19

> provided. Under subsection (b) hereof, the registrant shall not be
> entitled to recover profits or damages unless the acts have been
> committed with knowledge that such imitation is intended to be used
> to cause confusion, or to cause mistake, or to deceive.

In opposition, defendants merely offer that plaintiff's recovery must be limited to profits or damages arising after May 21, 2004.

To the extent that the Second and Third Affirmative Defenses seek to limit damages, the Court will deny plaintiff's motion for summary judgment on these defenses and permit defendants to proceed with such defenses for this limited purpose.

The defendants' Sixth Affirmative Defense asserts that "[t]he registered mark is being used by or with the permission of plaintiff, so as to misrepresent the source of the goods or services on or in connection with which the mark is used." While the Court has previously rejected the defendants' argument of an assignment, the terms and understanding of the oral agreement is not completely resolved. Therefore, the Court denies the motion as to the Sixth Affirmative Defense.

The Eleventh and Twelfth Affirmative Defenses can be addressed in unison. The Eleventh Affirmative Defense argues that "[t]here is no competition between plaintiff and defendants." The Twelfth Affirmative Defense maintains that "[t]here is no likelihood of consumer confusion." The arguments are basically the same. Both defenses essentially contend that the parties are not in competitive markets so as to lead to confusion among the public. As discussed above, the *Birthright* Court makes clear that a "determination that defendants' service marks are virtually identical to plaintiff's suffices to support a conclusion of a likelihood of confusion." *Birthright*, 827 F.Supp. at 1136. The parties are both engaged in the real estate business in the State of New Jersey using the same mark. The allegation that defendants were granted the exclusive right to use the Unicasa name

20

in Paterson does not support defendants' defense.  The public seeing the mark will undoubtedly

believe that ADHR, using the Unicasa mark, is affiliated with plaintiff.  Therefore, the Eleventh and

Twelfth Affirmative Defenses are dismissed.

      E.  <u>Counterclaims and Third Party Claims</u>

      In its Counterclaim, defendants alleged that subsequent to the initial oral agreement by which

plaintiff "permitted, if not encouraged" defendants to use the Unicasa name without payment or

material restriction, in or about 1998, the parties entered into an agreement for marketing services,

including the use of the Unicasa name, in exchange for payment of what was referred to as

"membership dues."  Defendants paid all invoices for its membership dues with the exception of the

final invoice dated June 24, 2001, on account of its reference to a "franchise/ownership fee."

Defendants contend that plaintiff breached the agreement by demanding that defendants execute a

licensing agreement, significantly limiting defendants' rights, for the continued use of the Unicasa

name.  The Third Party Complaint alleges that Marlio Chaux either made the agreement or falsely

represented that plaintiff would honor the agreement, intending that defendants would rely on such

representations and expend substantial time, money and effort to develop a business reputation that

the public has come to associate with the Unicasa name.  It is alleged that Marlio Chaux breached

the agreement and caused defendants to sustain damages.

      In its Amended Answer, defendants assert additional claims and allegations by which

plaintiff, Third Party Defendant Unicasa Universal Inc. a/k/a Unicasa Universal Realty Corp.

("UUI"), and Marlio Chaux (collectively referred to by defendants as the "Venture") reaped the

benefits of Spinelli's work and improperly permitted Unicasa affiliates to operate in territories

exclusively granted to defendants.  As alleged by defendants, in early 1995, the Venture solicited the

services of Spinelli to develop a business model for Unicasa.  In the latter part of 1995 or early 1996, Spinelli entered into an oral agreement with Marlio Chaux and Joseph Torres, by which Spinelli could use the Unicasa name in her business without any restriction.  Encouraged by the Venture to open a Unicasa real estate office, Spinelli informed Marlio Chaux that she was interested in opening an office in Dover, New Jersey.  The Venture advised Spinelli that she had the exclusive right to use the Unicasa name in Morris County, New Jersey, without any restriction.   In light of these representations, Spinelli purchased a building and opened a Unicasa real estate office in Dover, New Jersey in October 1997.  In December 1997, Spinelli entered into another oral agreement with Marlio Chaux by which Spinelli claims to have been granted the unrestricted, perpetual use of the Unicasa name for her business in exchange for a $10,000.00 payment to UUI.

In 1998, at the request of the Venture, Spinelli allegedly expanded the scope of the services provided to include various seminars and lectures.  Also in 1998, Spinelli claims to have notified Marlio Chaux that she was considering changing the name under which she operated her Dover real estate office to no longer operate under the Unicasa name, and opening a Clifton, New Jersey office under a different name as well.  In response, in an alleged attempt to ensure Spinelli continued to operate under the Unicasa name, the Venture agreed to give Spinelli the exclusive right to the Unicasa name in Paterson, New Jersey, without restriction.[4]  Additionally, the Venture allegedly promised that Spinelli "would always have a share or part of the Unicasa company," that the parties "would share in the profits generated from the Unicasa name and concept," and that Spinelli would

---

[4] This seems to contradict the claim that Spinelli was previously granted "unrestricted, perpetual use" of the Unicasa name, unless plaintiff is claiming such use extended only to the Dover office.  However, if an agreement was reached in connection with the Dover office only, such an allegation would seem contrary to previous claims of an assignment of rights.

"retire and collect a share of the fees paid by other Unicasa offices." Based on these representations and assurances, Spinelli did not change the name of the Dover office and opened a Unicasa real estate office in Paterson, New Jersey. Thereafter, with the express approval of the Venture, Spinelli opened a Unicasa real estate office in Fort Lee, New Jersey.

In July 2002 and again in 2004, the Venture permitted other real estate offices to use the Unicasa name in Paterson, New Jersey, despite defendants' claim of an exclusive right to operate Unicasa offices in the area.

As a result of the aforementioned allegations, defendants allege a breach of contract, unjust enrichment, claims of accounting, promissory estoppel, and request specific performance.[5] As to the initial Counterclaim and Third Party Complaint, by which defendants argue that plaintiff breached the alleged agreement by demanding defendants execute a written licensing agreement, plaintiff claims such allegations are "preposterous on its face" and argues that such does not state a valid cause of action. As to the five additional claims asserted in the Amended Answer, Counterclaim, and Third Party Complaint, plaintiff argues that the claims are largely incomprehensible. Nevertheless, plaintiff claim that there is "a veritable mountain of undisputed evidence" that would support granting the motion for summary judgment. While the "facts common to all counts" of the Counterclaim and Third Party Complaint are confusing, questionable, and difficult to mesh with defendants' previous arguments, the pleading is wrought with factual issues. There are several

---

[5] Although plaintiff argues that the Third Party Complaint is improper and should fail because no evidence supports the conclusion that Marlio Chaux is liable to defendants for plaintiff's claims, Fed. R. Civ. P. 14 "has been liberally interpreted to allow Third-Party claims to be asserted even though they do not allege the same cause of action or the same theory of liability as the original Complaint." *Wanta v. Powers*, 478 F.Supp. 990 (M.D. Pa. 1979).

alleged oral agreements, none of which are entirely conceded by the parties.  The factual disputes should be fleshed out at trial before an appropriate trier of fact.

IV.

Defendants' motion for summary judgment is denied, except as to Defendant Arias as against whom the Complaint is dismissed.  As to plaintiff's motion for summary judgment, the motion is denied as to plaintiff's claims, defendants' Counterclaims, and defendants' Third Party Complaint, as well as to defendants' Second, Third, Fifth, Sixth, Tenth, and Thirteenth Affirmative Defenses, but granted as to the First, Fourth, Seventh, Eighth, Ninth, Eleventh, Twelfth, and Fourteenth Affirmative Defenses.

March 7, 2007                                   *s/Peter G. Sheridan*
                                                PETER G. SHERIDAN, U.S.D.J.